UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America, et al.,                           Civil No. 72-0019 (PAM/JSM)

Plaintiffs,

v.                                                **MEMORANDUM AND ORDER**

Northshore Mining Company, et al.,

Defendants.

---

This matter is before the Court on the Motion for Clarification or Relief from Judgment filed by Defendant Northshore Mining Company ("Northshore"). In this Motion, Northshore asks the Court to clarify or vacate the injunction a former Judge of this District entered in 1974, as modified by the United States Court of Appeals in 1975.

**BACKGROUND**

The facts of this long-running dispute are set forth fully in the various court opinions and memoranda issued in this matter, including the decision at issue in the instant Motion, Reserve Mining Co. v. Environmental Protection Agency, 514 F.2d 492 (8th Cir. 1975) ("Reserve I"). In brief, in 1972 the federal government, along with the States of Minnesota, Wisconsin, and Michigan, brought suit against Reserve Mining Company (now known as Defendant Northshore) seeking to curtail Reserve's discharge into Lake Superior of tailings from its taconite pellet operation at Silver Bay, Minnesota. In June 1973, for reasons not entirely clear, the focus of the litigation shifted from Reserve's discharges into Lake Superior to Reserve's emissions of asbestos and asbestos-like fibers into the air around Silver Bay. See Reserve I, 514 F.2d at 501.

After a lengthy bench trial, the District Court imposed sweeping injunctive relief, ordering Reserve to shut down its operations. The District Court based this order on its findings that Reserve's discharges into the water and air "substantially endanger[] the health of" people who lived and worked in the vicinity of the plant. United States v. Reserve Mining Co., 380 F. Supp. 11, 16 (D. Minn. 1974). Several weeks later, the Eighth Circuit Court of Appeals stayed the injunction, allowing Reserve to re-open its facility. Reserve Mining Co. v. United States, 498 F.2d 1073 (8th Cir. 1974).

The Court of Appeals, sitting en banc, then reviewed the merits of the case. As the en banc panel recognized, asbestos poses significant risk of cancer to humans who breathe the fibers. Id. at 501; see also Metro-North Commuter R. R. Co. v. Buckley, 521 U.S. 424 (1997) (assuming without discussion that asbestos is cancer-causing agent); Adamo Wrecking Co. v. United States, 434 U.S. 275, 297 n.9 (1978) (noting that "even low-level or intermittent exposure to asbestos can cause cancer") (citing 38 Fed. Reg. 8820 (1973)). The court found that "Reserve's air and water discharges pose a danger to the public health and justify action of a preventive nature" and thus upheld the District Court's decision to enter an injunction. Reserve I, 514 F.2d at 535. The panel modified the injunction, however, allowing Reserve a "reasonable time" to implement controls at its plant that would reduce emissions into the air and water. Id. at 538.

Because no expert or governmental authority had promulgated any standard for medically acceptable asbestos exposure, the appellate panel fashioned one. This so-called "control city" standard required Reserve to

2

use such available technology as will reduce the asbestos fiber count in the ambient air at Silver Bay below a medically significant level. According to the record in this case, controls may be deemed adequate which will reduce the fiber count to the level ordinarily found in the ambient air of a control city such as St. Paul.

Id. at 538-39. The Minnesota Pollution Control Agency ("MPCA") tested the ambient air in St. Paul and in Silver Bay in the late 1970s and early 1980s, after Reserve instituted pollution controls, and determined that the fiber level in Silver Bay was below the fiber level in St. Paul.

In the years after the Eighth Circuit's ruling, Reserve applied for and received various permits for its operations at Silver Bay. All permits applicable to Reserve's air emissions contained the "control city" standard. Reserve initially challenged this language in Minnesota state court, and the Minnesota Supreme Court ultimately upheld the inclusion of the "control city" standard in Reserve's permit. Reserve Mining Co. v. Minn. Pollution Control Agency, 267 N.W.2d 720, 725 (Minn. 1978) ("Reserve III").[1]

In the intervening 30 years, Reserve/Northshore stipulated at least twice to the applicability of the "control city" standard to its operations in Silver Bay. (See Cool Aff. Ex. D, Part 4.c (1997 Stipulation Agreement); id. Ex. G, Part 8.d (2003 Stipulation Agreement).) In 1982, the parties stipulated to the administrative closure of the court case. However, at

---

[1] The year before Reserve III, the Minnesota Supreme Court weighed in on Reserve's attempts to find a suitable place to dispose of the tailings that previously had been deposited into Lake Superior. Reserve Mining Co. v. Herbst, 256 N.W.2d 808 (Minn. 1977) ("Reserve II"). Much of the litigation in this case subsequent to Reserve I involved disputes involving land disposal of the tailings. See, e.g., Reserve Mining Co. v. Minn. Pollution Control Agency, 434 F. Supp. 1191 (D. Minn. 1977) (Devitt, C.J.).

the parties' requests, the Court retained continuing jurisdiction over the matter: "If in the future any party wishes to raise any such issue for Court determination, the party may do so by serving and filing an appropriate motion . . . ." (Order of Apr. 22, 1982, at 4.)  It is far from clear that the parties or Court intended for jurisdiction to continue for 25 years.  (See id. at 2-3 (noting that United States requested continuing jurisdiction until "at least July 1, 1981" and that State of Minnesota requested continuing jurisdiction until "at least July 1, 1982").)

After the 1982 Order, there was no activity in the case for more than 20 years.  In 2005, the MPCA notified Northshore of its intent to once again monitor the air in St. Paul and Silver Bay.  The MPCA found that the current fiber level in the ambient air in St. Paul is lower than that found in St. Paul in 1979 and 1980.  The MPCA made clear to Northshore that it expected Northshore to comply with the lower fiber level found in the new studies.  When the MPCA issued a new permit to Northshore in 2006, that permit contained the same "control city" language that was in all Northshore permits since 1975.

Northshore objected to including the "control city" language in the 2006 permit, raising some arguments it raises here.  Rather than appeal the permit to Minnesota state courts as it had done previously, Northshore submitted a request for an administrative amendment to the permit, asking the MPCA to remove the "control city" language.  In February 2007, the MPCA denied the request, finding that the requested elimination of the "control city" language in the permit was a request for a major amendment that required public notice and comment.  Notably, the MPCA did not contend that the existence of the

1975 injunction made removal of the "control city" language impossible, or that such language could be removed only by the federal courts. (See Cool Aff. Ex. M at 3 ("The MPCA has determined that [Northshore]'s proposal to eliminate the control city standard . . . must be addressed using the major permit amendment provisions in Minn. R. ch. 7007.").) Northshore appealed this determination to the Minnesota Court of Appeals. That appeal is still pending. Northshore Mining Co. v. Minn. Pollution Control Agency, No. A07-0634.

Shortly after taking the appeal, Northshore filed the instant Motion, seeking to clarify the "control city" standard or, in the alternative, seeking relief from the 32-year-old judgment of the Eighth Circuit Court of Appeals.

In the meantime, the MPCA has informed Northshore that it will develop a numeric standard for the asbestos fiber limit in Northshore's permits, rather than relying on the "control city" standard. MPCA intends to have this standard in place early in 2008, after which Northshore can challenge the fiber limit through administrative and state-court proceedings. In addition, the United States Environmental Protection Agency ("EPA") apparently is researching safe ambient asbestos exposure levels and will release that research to the states to allow them to promulgate exposure standards. The target release date for the research is spring 2008. The EPA expects to promulgate asbestos emissions limits for taconite plants sometime in 2009. (Minn.'s Opp'n Mem. at 16 n.4.)

**DISCUSSION**

As a threshold matter, the Court must determine whether it has jurisdiction to hear the Motion. In part, this Court's jurisdiction rests on whether Northshore has standing to

challenge <u>Reserve I</u>'s "control city" standard.[2]  According to the United States Supreme

Court, a plaintiff has standing if: (1) the plaintiff suffered an "injury in fact "; (2) there is a

"causal connection between the injury and the conduct complained of"; and (3) it is "likely,

as opposed to merely speculative, that the injury will be redressed by a favorable decision."

<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992) (citations and quotations

omitted).

Here, Northshore has failed to show that a decision giving it the relief it seeks will

redress the harm it is allegedly suffering.  There is no dispute that the MPCA permits under

which Northshore has operated and continues to operate contain the "control city" standard.

Northshore must comply with the "control city" standard not only because it is bound by the

federal injunction, but also because Northshore's state operating permits require compliance

with the standard.  Northshore must challenge the administrative application of the "control

city" standard through state administrative procedures.  <u>See</u> <u>Reserve Mining Co. v. Minn.

Pollution Control Agency</u>, 434 F. Supp. 1191, 1193 (D. Minn. 1977) (Devitt, C.J.) ("Whether

---

[2]  After the hearing on this Motion, the Court requested letter briefs from the parties addressing whether the Court continued to have pendent jurisdiction over this matter, given that the only issue remaining is one of state law.  All parties submitted briefs on the issue, agreeing that the Court has pendent jurisdiction to enforce or lift the 1975 injunction. However, some parties also used the Court's very limited request as an opportunity  to re-argue the merits of the Motion.  Northshore's "letter" brief was almost 20 pages; the State of Minnesota's was more than 20 pages.  This matter was fully and completely briefed (including an extension of the word-count limits) prior to the hearing and, as only the Save Lake Superior Association recognized, the Court's request for additional briefing did not seek argument on matters other than pendent jurisdiction.  In the future, the Court urges counsel to comply with the Court's requests and also to use their clients' time more wisely when doing so.

the state agencies can incorporate the federal ambient air standard into the terms of the permit is a question of state law."). Thus, a decision lifting or vacating the federal injunction will have no effect on Northshore's obligation to comply with the "control city" standard contained in Northshore's permits.

Both federal and state law make clear that the "control city" standard is an administrative standard independent of the terms of the injunction. Under Minnesota law, air quality standards in permits are those "the agency determines to be necessary to protect human health and the environment." Minn. R. 7007.0800, subp. 2. Although the "control city" standard was at one time a court-fashioned remedy, by including it in Northshore's permits the MPCA has determined that the "control city" standard is necessary to protect the health of Minnesotans and the environment. Furthermore, the Clean Air Act makes clear that permit conditions are independent state standards. The Act defines "emission standard or limitation" as "any other standard, limitation, or schedule established under any permit issued . . . under any applicable State implementation plan . . . , [or] any permit term or condition." 42 U.S.C. § 7604(f)(4) (emphases added). The "control city" standard has evolved into and also operates as an independent administrative standard rooted in state law that will not be affected by any change to the 1975 injunction.

Moreover, the passage of time vitiates any claim Northshore may have that the "control city" standard is not an independent state administrative standard. Northshore has had multiple opportunities to challenge the "control city" standard's inclusion in its permits, and when it has done so the administrative process has yielded a decision against

Northshore's interpretation.[3] By now, 32 years after the Eighth Circuit first formulated the "control city" standard, this standard is ingrained in the administrative process and has become part of the independent state administrative standards for emissions in Northshore's permits.

A Court should not, and indeed cannot, issue a decision that has no practical effect. See Warth v. Seldin, 422 U.S. 490, 505-06 (1975); C. & S. Air Lines v. Waterman Corp., 333 U.S. 103, 113 (1948). The redressability doctrine, or the idea that a party lacks standing if a favorable court decision is unlikely to redress the alleged injury, is linked not only to constitutional principles of standing but also to the long-standing prohibition on advisory opinions. See Erwin Chemerinsky, Federal Jurisdiction § 2.3.3 (5th ed. 2007). Here, there is no doubt that even if the Court purported to relieve Northshore from the permanent injunction entered 32 years ago, Northshore would receive no practical relief. Although it would no longer be bound by the Eighth Circuit's 1975 opinion, it is still bound by state permits requiring compliance with the "control city" standard.

---

[3] Northshore argues that the instant challenge to the "control city" standard is the only challenge available to the parties. In 1978 the Minnesota Supreme Court determined that "neither PCA, the mining companies, nor the state courts, are at liberty to modify or set aside [the "control city"] standard" because the federal courts had retained jurisdiction over the case. Reserve III, 267 N.W.2d at 725. It may be true that only the federal courts can modify or lift a federal injunction, but it is not accurate to say that only federal courts may determine the parameters of the "control city" standard as contained in Northshore's permits. Indeed, the opposite is true: only the MPCA and Minnesota state courts may determine the parameters of the "control city" standard in Northshore's permits.

Furthermore, it is apparent that the Eighth Circuit did not intend the "control city"

standard to be the last word on  what level of fibers Northshore should be allowed to emit

into the air.  The injunction does not require that Northshore's emissions fall below the fiber

level in St. Paul, but rather requires that Northshore's emissions remain "below a medically

significant level."  Reserve I, 514 F.2d at 538.   Thus, as the court recognized, the State of

Minnesota was free to impose on Northshore whatever standards it deemed appropriate to

ensure that the fiber emissions were "below a medically significant level."[4]  The fact that

Minnesota imposes the requirement that the fibers in Silver Bay not exceed the fibers in St.

Paul is now wholly a matter of state law, independent of the federal litigation.

This decision means that the 1975 injunction no longer has any force or effect.  The

injunction has been effectively incorporated into state administrative law, in the form of the

"control city" language in Northshore's permits.  Any conclusion that the Court might make

on the meaning of the "control city" standard would have no meaningful effect because

Northshore, as the only party bound by the injunction, is also required to comply with the

_____

[4] Despite Northshore's contentions in this Motion, the injunction does not create a "safe harbor."  In other words, the Court finds unpersuasive Northshore's argument that as long as Northshore's emissions are below the level of fibers found in St. Paul in 1978 through 1980, Northshore has complied with the terms of the injunction.  See, e.g., Reserve III, 267 N.W.2d at 725 ("[A]s all parties agree, St. Paul is not necessarily the only control city to be used for comparison with Silver Bay.  At such time as reasonably reliable fiber counting techniques are applied in some other city, remote from exposure to taconite dust emissions, a new basis for comparison may be established.") (emphasis added).  Rather, as discussed in the text, the injunction requires Northshore's fiber emissions to be "below a medically significant level," and it is the State's responsibility to determine what that medically significant level is.

independent "control city" standard in its state permits. The injunction has outlived its enforceability. It therefore is best described as moot. See 43A C.J.S. Injunctions § 90 ("If the thing sought to be enjoined in fact takes place, is no longer taking place, or can no longer take place, the grant or denial of an injunction becomes moot.")

Even if Northshore's Motion could be read as a challenge to the "control city" standard under the Minnesota's Administrative Procedure Act, Minn. Stat. ch. 14, it is clear that Northshore has not exhausted its state remedies on this challenge. See, e.g., Minn. Stat. § 14.44 (proving for declaratory judgment action in Minnesota Court of Appeals to review agency decision). Thus, the Court would have no jurisdiction to hear such a challenge.

**CONCLUSION**

Northshore does not have standing to challenge the 1975 injunction, and its Motion must therefore be denied. The Court also finds that the injunction is unenforceable and therefore moot. Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendant's Motion for Clarification/Relief from Judgment (Docket No. 1927) is **DENIED**; and

2.      The Injunction as modified by the Eighth Circuit Court of Appeals, 514

N.W.2d 492 (8th Cir. 1975), is **MOOT**.


Dated:    December 20, 2007    


                                                  s/Paul A. Magnuson          
                                                 Paul A. Magnuson
                                                 United States District Court Judge